United States v. Jose and Mario Vega. Good morning to everybody. Good morning, Your Honors. James Crawford on behalf of Mario Vega. Unless the Court has any particular area that I would like me to address, I'd like to start out with addressing the reasonableness of the stop and the detention and the search of the vehicle. The Court will notice, based upon the evidence that was presented during approximately a two-day hearing on the motion to suppress, the police officers justified the stop of Mr. Vega's car based upon an assertion that he was parked 36 inches or more from the curb. But the evidence also established that the police officer didn't just approach the car with the intent to cite or warn Mr. Vega. They approached the car. They had their guns at minimum exhibited, if not drawn, upon Mr. Vega. They detained Mr. Vega. They ordered him out of the car. They placed him on the sidewalk. Isn't that permitted? Isn't there some Supreme Court decision, whether it's counterintuitive or not, that recently or in the last couple of years said that if there's grounds to make a traffic stop, it doesn't really matter if the police have some ulterior motive? That's true. That's – I believe that's Wren v. United States, the subjective motivations of the police. Why isn't that the end of this? Excuse me? Why isn't that the end of the issue that you're saying they were ready, you know, like they knew he – they were going after him. They had their guns drawn. They knew he was involved, or they thought he was involved in some drug thing. But I think the – Why doesn't Wren say forget about it? Because I understand that the subjective intent of the officers pursuant to the U.S. Supreme Court is not relevant for this Court to take into consideration or the district court in litigating a motion to suppress evidence. However, when the court is looking at the totality of the circumstances and determining whether or not the detention was reasonable under the Fourth Amendment, I think the court has to look at all of the circumstances, and I believe it was Knowles v. Iowa. In Knowles v. Iowa, the Supreme Court stated something to the effect that if the purpose of the stop is for a minor traffic violation, the nature of the stop should be consistent with that. So the officers, if they're stopping Mr. Vega for purposes of issuing him a simple warning or a simple citation, drawing guns and detaining him and ordering him out of the car, I believe is unreasonable. If we get into the reasonableness of the search, but then the government, they listed several exceptions to the warrant requirement in justifying the warrantless search of the car. First, there was the impound exception to the warrant requirement. The impound exception to the warrant requirement, as the court is well aware, was enacted for the purposes of protecting two people, both the suspect or the accused, from having his property lost or destroyed by a negligent officer. And on the other hand, it's also designed to protect the police from being wrongfully accused of being that negligent officer. That is the purpose of the inventory exception. It is not a ruse for police to justify conducting a search of the suspect's car. In this particular case, the court, it was a little unclear, but basically it found two exceptions to the warrant requirement to be applicable. The inventory exception and the automobile exception. Is your point that by ordering him out of the car, which you say was unreasonable, a search was illegal? The search was illegal. What if they left him in the car and searched the car with him in the car? I don't believe that would have made a difference. They would have found it anyway, right? What right did they have? Well, I don't believe the ends justifies the means, because that's the purpose of the Fourth Amendment, is to protect a suspect from the means asserted by the police in obtaining evidence. But once they stopped him for a, even a pretextual DMV violation, and they asked him for the registration of the car and his ID, which he didn't have. The evidence is contradictory. There was evidence also at trial that he had an Idaho driver's license in his wallet. I don't have the citation. So you didn't show it to the police. Then at that point, can't they search the car, whether he's in the car or out of the car? What does it have to do – what's the significance of having him step out of the car have to do with it? Well, having him step out of the car and being detained, I believe, in effect, elevated this from a simple investigatory detention under Terry v. Ohio to a de facto arrest, which is substantially a higher degree of detention than that which Terry v. Ohio permitted, based upon nothing more than a showing of reasonable suspicion to believe criminal activity was afoot. Did they tell him he was under arrest? No, they did not. But based upon the assertion and the showing of force, I believe any person in Mr. Vega's position would not have believed that they were free to leave under those circumstances. Well, he wasn't free to leave. They were giving him a ticket. They should have cited him, released him, rather than going a step further and having a dog go to the car and conducting a search. Well, that takes us to the next point. The judge found that he didn't have a driver's license. There was some evidence that he did. There was some evidence that he didn't. The judge found that he didn't. What? So then don't they then have the right to impound the car? They can't put him back in the car and let him drive off without a license. That's true. So what's the problem there? Well, first, I think the factual findings by a district court are reviewable by this court for clear error. And I think based upon the evidence that was presented either during the hearing on the motion to suppress or the subsequent evidence that was presented either at the first trial or the second trial, but there was evidence that Mr. Vega had a valid Idaho identification or Idaho driver's license on his person. Yes, and there was evidence that he didn't. I believe that the subsequent evidence came out after the hearing on the motion to suppress. Well, let's assume the judge could have found that he didn't. Okay. Then what? Then if he didn't have a driver's license? Yes. They can't let him go back in the car and drive off. Okay. And then the question is, is the nature of the car at that point, right? They would have been entitled to impound the car under the California Vehicle Code at that point. And if they impound the car, they're entitled to search it for an inventory search, right? After the car is impounded. There's no cases that I've been able to find in the Ninth Circuit or the U.S. Supreme Court that have yet approved the pre-impound exception to the warrant requirement. Rather, the car needs to be impounded pursuant to standard police policies and procedures, and once the car is impounded, the officers are then justified or entitled to conduct the necessary impound search. If they impound it, that's 30 minutes later and they search it. They're about to go to find the same thing. Permitting the impound prior to the impoundment of the vehicle would only allow the exception to absorb the rule. And if the exception absorbs the rule, the narrow interpretation of this exception to the warrant requirement has been overcome. And I believe that that is not the purpose of the impound exception. It has a very strict, narrow purpose to protect a suspect from having a police officer wrongfully destroy his property and to protect the police from having a suspect wrongfully accuse him of destroying his property.  Kennedy. Sometimes they're done at an impound lot. They shouldn't tell us anything about that. There's nothing in the record, Your Honor, about that. In fact, the tow truck had not yet arrived at the time that they even conducted this so-called impound search. What you're saying is if the impound search had been done later, then the defense would have been better off by being able to imply something had been planted. I don't know if that's necessarily – I wouldn't make that insinuation, Your Honor. But also as to the automobile exception, if I could briefly address that. Again, the purpose of the automobile exception to the warrant requirement is the ready mobility of a motor vehicle under Carroll v. United States. And I'm not going to contest the applicability of the motor vehicle exception in this particular case because of the fact that the vehicle is already seized by police. That argument is gone and it's failed. I don't know if it was this court or the U.S. Supreme Court, but it's rejected previous arguments by the defense that just because the police have surrounded and swarmed the vehicle and now have seized it, that ready mobility argument is undermined. I believe that's the way it should be, but the courts aren't going to agree with me no matter how much I air that out. Excuse me. If you wanted to finish your sentence, then I want to change the subject for a second. Yes, certainly. I'm worried about the expert testimony about the drug structure. Yes, Your Honor. I'm not sure I understood what the relevance of this testimony was, but as you make the point, I don't really see, I'm not clear why it should have been admitted, but by the same token, I don't see what harm it did. It seems so tangential and almost irrelevant as to be harmless. Can you tell me there? Yes, Your Honor. The evidence is inherently prejudicial. It goes just like gang evidence, evidence of drug-structured organizations. It implies something beyond that which the evidence has presented. All of the cases that have condoned and found prejudicial, which are in my brief, which I don't have in front of me at the moment, but all of the cases that have found prejudicial error for the admission of that type of evidence have noted that it impermissibly allows the jury to infer that there's something else going on out there. There were two things, if I understand correctly, two opinions that were expressed. If there's more to it, let me know, but I jotted it down. One, the guy said it's not unusual for street-level dealers to have more than one supplier. Yes. It's not unusual. And the second one is it's not necessarily unusual for a supplier to act as a delivery person. Not necessarily unusual, I don't even know what that means. It means it may be unusual, it may not be unusual. I don't know how that lays a glove on you, really. But in the other one, it's not unusual for a street-level dealer to have more than one supplier. What did this tell us? I don't believe that the evidence was relevant to tell the jury anything that they needed to find in this particular case to determine whether or not Mr. Vega was guilty of the crime of conspiracy. I'm inclined to agree with you, but I don't see where it hurt you, either. It seems to me beside the point. Well, if we're talking about a conspiracy, we're talking about an agreement between two or more people to engage in some type of criminal conduct in an overt act in furtherance of the conspiracy. Those are the simple elements of any conspiracy. And in this particular case, it is insinuating or it's inferring that there was more people, that there was a structured organization, that this was planned, it was plotted out. The defense theory of the case is Mr. Vega on May 11, 2001, and his roommate pull up to Jose Vega's home. Jose, hey, brother, how you doing? Comes out, brings a plate of food covered with foil, gives it to Mr. Vega. He goes on his way, and he gets pulled over on Patty Lane by the Baldwin Park Police Department. Well, a little bit more than that. In exchange for the plate of food, he gave 223 grams of heroin. I believe that the heroin was in a motor vehicle part that was confined within the vehicle underneath the seat, is where they found the heroin. I don't believe that transferred. I believe in the new trial, the evidence showed that it was a plate of food, and that's what one of the investigating officers testified to, that it was a plate at least covered with foil. And how did Jose get the 223 grams? That was probably who his supplier is. It's never been resolved. Oh, that was Juan. Juan Jose, my client is Mario, Your Honor. No, I understand that. Okay. But my question was, wasn't the evidence that the 223 grams were delivered at the same time as Mario got his plate of food? I believe the evidence is unclear as to that. I don't think that they saw that the motor part transferred from Jose to Mario at that point, but rather it was a plate covered with foil, and I don't believe the evidence. As to this expert testimony, I tend to agree with Judge Silverman that the two or more suppliers is irrelevant in this particular case. But isn't the evidence that the distributor sometimes supplies or delivers himself, isn't that relevant? Because that's what the prosecution was casting Mario as doing, the distributor who was delivering himself to his street-level salesman. Well, I believe by having that expert testimony being presented, it makes inferences and it allows the jury to make inferences beyond that which the evidence is supporting. Well, there's a charge of conspiracy. Mario and Jose are conspiring. Mario Jose and his wife. Who else was there? There was no other evidence of any other players to my recollection. But three is insufficient for a conspiracy. Absolutely. More than necessary. That should have been the extent of the trial, the three people, and not inferring that there was other people and that there was this complex, strict structured organization to allow the jury to have inferred that Mario had a greater role in this offense than that which was established by the evidence. And I believe, and if you look at UMAGOT, United States versus UMAGOT, I believe the evidence will establish that he had participated in one transaction. All of the surveillance, all of the witness's testimony over a five-month period of investigation failed to connect Mario Vega in any other way to this conspiracy. And under UMAGOT, even if it is the $5,000 deal, the one, it still is his participation in one limited transaction. And his knowledge and knowing participation is still questionable based upon the state-of-the-art evidence. And I believe, again, that would undermine the sufficiency of the evidence and show that since it was a single transaction and his participation in the single transaction, that there was little or no evidence to support the conspiracy. And based upon the slimness of the evidence to support the conspiracy charge, the evidence of the expert about the structure of an organization would be prejudicial because it would further have allowed the jury to have supplemented the state-of-the-evidence with this expert testimony, which was prejudicial and irrelevant. Do you want to reserve some time for rebuttal? Absolutely. Thank you, Mr. Crawford. Why don't we hear from Mr. Jose Vega's lawyer now, and then we'll get the government all at one time. Good morning. Good morning. May it please the Court. My name is Shexley Marcy. I'm here on behalf of Jose Vega. Can you speak up just a smidge for us, please? Okay. In the absence of other interest from the Court, I would like to start by discussing the issue of the braiding material that the DEA agent had decided not to turn over to the prosecution. There is a real interesting issue here in terms of what standard should be used. Should the DEA agent's deliberate suppression of that evidence subject this to a higher standard of reasonable likelihood that the evidence could have affected the verdict, or would the more lax reasonable probability standard be used? I haven't found a case either way that determines that, but in terms of the practicalities of the matter, the prosecution is the only party that can make it clear to the DEA that, yes, you have to turn over this evidence. It's not permissible for you to determine whether you think someone was telling the truth and then suppress the evidence. So that holding – Was this disclosable to you under Rule 16 or Brady, or under what theory was it really to be turned over to you? Under Brady. Not under Rule 16? We've argued Brady. Well, if it's Brady, how does this exculpate him? It goes to his only defense. In fact, this case is real simple because Jose said, yes, I did sell the drugs. He's never arguing that he didn't sell the drugs. The only issue is his word against the confidential informant's word as to whether the CI had actually called him again and again. We have the CI who was sort of a bit of a questionable character. He was a schoolteacher who was selling drugs around 13- to 14-year-old kids, and obviously I'm sure that the jurors might have viewed him, you know, with a little bit of skepticism. And then we have my client, Jose, and the jury is trying to decide who to believe. Did the CI keep calling my client or did he not? And the jury was really debating that issue. In fact, they sent a note to the judge saying, could you please tell us a little bit more about whether repeated phone calls would rise to the level of entrapment? So if we had even had one juror who could have said, well, yeah, I believe Jose, that the CI kept calling him, I mean, that would have made a real difference. So Jose's credibility was really an issue. And, again, the only two areas where Jose's credibility was even brought up were, first, what I just mentioned, the CI calling him, and, second, this whole issue of Juan. Did Agent Davis testify? Agent Davis did, but very briefly. Is there any reason why Agent Davis couldn't have been asked about the Juan? Yeah. What? Because Agent Davis had purposely seen the report that said that Jose mentioned Juan and kept it to himself instead of disclosing it. But Jose knew what he told Agent Davis. Right. So is there any reason why Agent Davis couldn't have been asked? Didn't Jose mention Juan to you? He was just never even asked the question. Actually, the way that it was set up in terms of the agents was the agent who testified previous to Agent Davis had sort of gone through the whole thing and said, no, there's no mention whatsoever of Juan, or not that I recall, that I don't recall. Okay. That was that guy. He didn't recall. Now there's another guy who was there. And that guy, Davis, was never asked. The last guy didn't recall, but do you recall? Right. However, I mean, the whole reason for getting all the written reports and all that stuff is so that you know which agent knows what. So if you get the report and you've got... And you're saying this is somehow exculpatory, more than just a discovery violation that this exculpates him. And your guy knew that he had told Agent Davis this. And when Agent Davis was on the stand, Agent Davis was never asked. Isn't it true that Jose said this to you? I think the reason for that is that Agent Davis's testimony was incredibly brief. I mean, he wasn't even asked about any of this stuff. Well, you know, if it's brief because people sit down when they're done, you know. I mean, it could have been longer if more questions were asked of him. Your Honor, I'm sure trial counsel would have asked a great deal more questions had trial counsel been provided with what was required under Brady, which was this report saying, oh, yes, he did mention Juan. He mentioned Juan first. I mean, if you don't have that to go on, what are you going to ask? You can't shoot in the dark with every single person. Well, he was asked of the other agent. Right. And the reason why I asked and answered is I don't remember. That was that guy. Why wasn't the same question asked of Davis? You know. Couldn't have been asked of Davis. It certainly could have been asked of everybody. But the whole point of getting all the material is that you know, okay, this agent took this note and saw this here. Therefore, it's relevant for me to question this agent about that. You know, he had already questioned the previous agent, you know, ad nauseum about it. And the guy was saying, I don't remember. I don't remember. I don't recall. And you've got the second guy. I'm sorry. Go ahead, Your Honor. May I interrupt you for just a second? Yes, you may. Let me see if I understand your credibility argument. You say that if the prior consistent statement had come in, Jose's credibility would have been bolstered. Correct? Correct. And then Jose testified that he got the heroin from Juan and sold it to the confidential informant. Right? Correct. So had he been believed that he got it from Juan rather than Mario, how would that have affected the entrapment defense? Does the trademark of one supplier over another affect entrapment? Does it make any difference? I see what you're saying. And that's, in fact, the attack that the trial court took. And I can understand why that question would come up. But I'm approaching it from an entirely different angle. I'm saying. But can you answer that one? Do you think that the identity of a supplier, whether it's Juan or Mario, makes a difference as to whether there was entrapment? If there was entrapment, there was entrapment whether Juan supplied it or Mario supplied it. Right? That's correct. Now, let me explain the angle that I'm approaching it from. I'm approaching it from the angle of Jose's credibility. As I said, is there that one juror among the 12 who thinks, I believe Jose over this confidential informant who the jury viewed, you know, very. Well, the confidential informant didn't know whether it came from Juan or from Mario. But the issue for entrapment was, was the C.I. telling the truth when he said that he did not call Jose outside the purview of the investigation? Or was Jose telling the truth when he said the C.I. kept calling him trying to get the drug? So that was the credibility issue. In your argument, you're saying the entrapment defense depended on Jose being believed. He says I was entrapped. He said that the C.I. The C.I. kept calling me over and over again. That was the third C.I. they had tried. He's not going to win on that unless he's believed. Right. Meanwhile, on this other issue of who was his supplier, he gives testimony and he's impeached with his written statement, written confession. Right. And this report that wasn't produced but should have been produced would have permitted him to be, he could have been rehabilitated. It's like a response to the impeachment. So the impeachment wouldn't have hurt his credibility that much. Your Honor, you summarized it much better than I ever could have. Isn't that the basic idea? Exactly. It would have rehabilitated him on who was his supplier, not on the entrapment, right? I think the argument you're making that's being made by appellant, at least as I understand it, is it would have rehabilitated his credibility that he's an honest person, or at least he's being honest in the courtroom on this occasion. And that might have helped him on the entrapment issue. But I want to know something. Banks is a new Supreme Court case. You're probably aware of it. Banks v. Dredke, and it's a Brady case. I don't know if you have addressed it. It just was decided February 24, so it was just last week. And I saw a summary of it. I wanted to ask both you and the government whether there was anything in what the Supreme Court said in Banks that's relevant to this Brady issue here. Your Honor, that being a new case, I would request to write a supplemental letter to the court on that. I would like to just briefly, unless there's more questions on this, move on to my next issue. I didn't mean, by the way, to interrupt your response to Judge Baez. Okay. The final issue would be the sensing entrapment and how this case compares to the Stauffer case and whether the district court used the correct standard. And I was troubled by the district court articulating the standard as whether my client was ready, willing, and able to sell drugs because, obviously, if he wasn't, none of us would be here. So in Stauffer, it's clearly the defendant was ready, willing, and able. And the issue is whether he's predisposed. You can take someone who is a street-level dealer, which Jose obviously is, and say, you know, sell us a small amount. And, you know, you fail with the first CI. You try it for a second for an agent. You fail with that guy. For whatever reason, you move on to the third CI, who happens to be Mexican or Mexican-American, speak the same language. You approach through family, friends, et cetera. And you keep persuading through small amounts, and you build up to a large amount. And the government's own witnesses said that, look, Jose's a street dealer, and there's no way he would even be selling, you know, 75 grams, let alone 225 grams. And there's no evidence at all that he sold to anyone other than the confidential informants. So, in fact, I believe that the facts of this case are even stronger than Stauffer for a finding of sentencing entrapment. And the real problem is that the district court, as the trial counsel, a federal public defender, pointed out, just used the wrong standard. Ready, willing, and able is a real toothless standard because it doesn't look at whether the person would actually have done it, but for what the government did. Did you want to reserve some time? Yes. Thank you very much, Ms. Merritt. We'll hear from the government now, please. May it please the Court, Ilana Arsen on behalf of the United States. Let me begin with the issue of whether the district court erred in denying a new trial to Jose based on the alleged Brady violation. First of all, defense counsel mentioned that there's a question as to what standard should be applied. In fact, that question is very well settled in the case law. The defense and the government both cited Steinberg, and there's a case cited within Steinberg for this proposition. That's Endicott. And essentially, what both of those cases say is that where the prosecutor knowingly uses perjury at trial, there is a higher standard. Absent that particular scenario, which has never been contended to be the case here, the usual Brady standard applies. And the Supreme Court in both the usual standard. Is the whether there's a reasonable probability that if disclosed, the results of the proceeding would have been different. And that is defined as undermining confidence in the verdict. So how do we know? How do we know what the jury would have thought of the impeachment defense? If, I mean, would have thought of the entrapment defense if there had been a response to the impeachment on the supplier issue by showing a prior consistent statement right after the event? First of all, Your Honor, it was not a prior consistent statement. And one of the points I want to make, and I'm actually going to give you a very long answer, because I need to back up to the second Brady element, which is how is this favorable to the accused? But with respect to the particular Favorable to the accused, at least on the issue of whether the accused is lying in the courtroom by saying, X is my supplier, not Y. That's correct. But the question is whether that's favorable to the accused under the Brady standard. And the Brady standard is it's favorable to the accused if it is exculpatory. This was not exculpatory evidence. The fact that he had a supplier was inculpatory because it shows that he participated. And it was inculpatory even with respect to his entrapment defense. Your Honor, this is the point where he testifies at trial. Isn't Brady a continuing obligation? It is. But when he So at the point he testifies at trial, and at the point the government decides to impeach his trial testimony with a written confession that's contrary to his trial testimony, then does that standard apply? Yes. Where the Brady standard comes in here is only with respect to impeachment and whether I think really it's whether it impeached Agent Gonzalez, who was called on rebuttal, to ask whether Wan had made the statement and said, I don't recall him saying anything about Wan. So, yes, we agree that Brady Why wouldn't it be relevant to the rehabilitation of the appellant? Well, it could be, but it's only I mean, it's not like I tried a thousand cases, but it seems to me almost every case that I can remember being tried, if a witness said something and then was impeached by some evidence, if there was some contrary evidence that put the witness back in another light, in a positive light, or explained it, people would introduce that to kind of rehabilitate their witness. And that's correct. And the government has never disputed and agrees that it became Brady at the point that there was impeachment. The only point I'm making is it did not become Brady before that point because it was not exculpatory. But what about at that point? Okay. At that point, Your Honor, there's certainly no question that whether he testified credibly or not about whether Mario was his supplier had some bearing on his credibility. Of course, that's true. We don't dispute that. But the question is, did the government's impeachment of Jose on that point undermine confidence in the jury's verdict that Jose was not entrapped? And as the district court correctly found after looking at the – after observing firsthand the entire trial, those two issues were not connected in this case. Wasn't there an argument made – did you try the case? I did not try the case. Wasn't the argument made by the prosecutor at the trial that – to the jury that this was a family business? There was an argument that it was a family business. Wasn't it – I mean, wasn't this business about Juan being a stranger to the family? Somebody was pestering him to sell the drugs. Wasn't that – wouldn't that negate that argument that it was a family business? I think you're confusing two different people. There was a family friend named Chino who introduced both of the confidential informants to Jose. That person was not a government agent. That was the government friend who Jose claimed was pestering him with respect to the smaller deals. With respect to the final deal where Mario was contended to be the supplier, only there was there a claim that the CI had made numerous calls to him. With respect to the question about the family business, yes, that did go to whether Mario was the supplier. But did that go to whether the defendant was entrapped in this entire case? And that entrapment defense could have been put on without ever talking about who the supplier was. That's kind of immaterial. It could be done without the supplier. But the question is whether impeaching him, like making it look like he lied about who his supplier was, could reasonably be taken to put the case in a different light that undermines the jury verdict. That's what it seems to me. And that depends on two factors under the case law. One, under Kiles v. Whitley, it depends on looking at the entirety of the suppressed evidence. And the entirety of the suppressed statement here was that at the outset of the interview he said, my supplier was Juan, and Juan's friend brought the drugs over to me at noon. The second part of that statement was demonstrably false, because there was surveillance testimony that a car had pulled up, and the only car that had pulled up during the relevant time period was Mario's car, meaning between the time that the informant had a conversation with Jose and he's waiting for the supplier to arrive. The only car that pulls up during that time is Mario's car. There is an exchange, and the passenger in the car, Mr. Medina, testified that Jose gave a yellow car part to Jose. Jose then goes to the deal. So you say the suppressed evidence or the Brady evidence that doesn't come out after the impeachment, that evidence would rehabilitate him in part, but it would also show he's a liar in part. In fact, overall, the statement was far more damaging, and it was not even the story that he gave at trial. The story that he gave at trial about Juan having brought the materials over 10 days earlier, that was never made prior to trial. That was never part of the post-arrest statement. The post-arrest statement was Juan's friend brought the drugs over at noon. At trial, that story was different. Why didn't the government produce this, at least at the point where he testifies at trial and then the government decides to impeach him with his contrary written confession? Your Honor. The government must have known that his statement after arrest was inconsistent with the written confession and consistent, at least in this one part, with the trial testimony. Your Honor, the record here shows the prosecutors were not aware that that prior statement had been made. It was not included in the DEA-6 report. The agent told the prosecutors about it basically the day after trial. As soon as the prosecutors learned of it, they instructed the agent to create a new DEA-6. They asked whether there were any notes. The notes were turned over, and that's when ---- But if the government didn't follow its normal procedures and made a mistake, why should, you know, why should the appellant have the risk of us guessing whether it affected the jury? Your Honor, I am certainly not condoning the government's behavior here. But the question before this Court is whether the Brady standard has ---- And that standard doesn't undermine our confidence in the jury. Correct. And it did not undermine the district court's confidence. And the case that I think is most significant for you to consider is not the recent Banks-Brady case, but the Supreme Court's previous Brady case, and that's Strickler v. Green. And that was a case, essentially, in which there was a government witness who was the only eyewitness to the abduction prior to the victim's murder, and made a number of statements describing this as a sort of terrifying induction, terrifying abduction, and then identified the victim as the person she saw in the car. It turned out after trial that there was undisclosed material in the police files, which the police were aware of but the prosecutor was not,  and this witness could not identify the victim as being the person in the car. That she hadn't even remembered being at the mall where this abduction took place, and that her daughter kind of jogged her memory, and in fact the witness was even thanking the police for being patient with her, quote, muddled memories. And that she had written off, even after she remembered this whole sort of terrifying abduction, as some kind of trivial college student's playing. And there the defense argued that the relevance of this material was that the defendant should have been convicted of first degree murder, not capital murder, and that this evidence was relevant. And the Supreme Court disagreed, basically finding two things. First, that with respect to guilt, that proof that the defendant was an equal partner was sufficient for capital murder. So even though the prosecutor had argued that this defendant was the moving party in the abduction, because the witness essentially testified that he was the person who was banging on the car, and inferred from that that he was this sort of ringleader in the later murder, that was not necessary to the government's proof, because as long as the two co-participants were equal partners, that was sufficient. And here they had to be equal partners, because the murder victim had basically been killed by dropping a 70-pound rock on her head, and one had to hold her down and the other had to drop the rock. Secondly, with respect to sentencing, the Supreme Court said, even though this testimony was relevant to the vileness and future dangerousness findings, there was other evidence which was far more damaging. And the reasoning on both of those counts is very similar to what is going on here. Again, we're not saying that it had no bearing on his credibility. The question is, was his credibility really undermined as a result of the lack of rehabilitation on this particular narrow issue, meaning whether he had previously mentioned Juan, or was it undermined because he gave a highly improbable story about how Juan had brought these drugs, which was contradicted by a great deal of other evidence. And in fact, the statement, had it been introduced, would have been very damaging because it was contrary even to his written statement and his trial testimony. Let me ask you a question about Mario's case. What does it mean when Agent Marzullo testified, it's not necessarily unusual for a supplier to act as a delivery person? What does that mean, it's not necessarily unusual? Maybe unusual, maybe not unusual? What does it mean? I think it's not a very well phrased question. I think what it was intended to show is that simply because he delivered the drugs doesn't mean that he can't be the supplier. And what that testimony was relevant. I mean, it sounds like he's got a Ouija board. I mean, it's kind of, what's he kind of just opining in general about life? Your Honor, I think what happened there is there was an objection, and sometimes when that happens the testimony doesn't come out as clearly as we would like. I think that it can reasonably be understood as saying it is not improbable, it's not contrary to my experience for the supplier to deliver their own drugs. And in a small organization. So what? I mean, what was the relevance of that? It was relevant because, you know, this testimony was not like Vallejo and McGowan and the cases where this court has said in a marijuana importation case where you don't have a conspiracy, you just have a driver who stopped at the border, you can't introduce evidence of, you know, how large conspiracies work and try to show that the person had knowledge on that basis. That's not what we were doing here. In fact, the district court excluded the unknowing courier evidence. The district court said you can't ask him, isn't it true that, you know, drug dealers don't usually entrust large amounts of drugs to unknowing couriers? We were precluded from asking that. All this testimony was probative of is was this person acting as the supplier or not? And that was the question. And that goes to the type of testimony that this court has allowed in other cases. For example, was somebody acting as a lookout based on their expert experience? Was somebody engaging in counter-surveillance? Was Mario acting as a supplier? Correct. Was Mario acting as a supplier? And that falls into the permissible range of testimony describing, based on expert testimony, whether somebody is filling a certain role. Is the person acting as a lookout? Is the person engaging in counter-surveillance? Do these activities further drug trafficking?  That type of testimony is permissible. We're not really even in the area of the impermissible testimony, which is what happens in non-conspiracy cases and whether you can ask to infer knowledge simply based on that person's role in the conspiracy. That's not what we're doing. We're saying, you know, does your expert experience help us determine that this person was the supplier? And so we are not in that area. In Mario's case, do you want to state your position with respect to the search of Mario's car? Your Honor, I think we've laid it out in pretty great detail in our brief. I think that where the confusion comes here has to do with the district court's findings. And the district court found, and this is at GER, page 165 and 66, that Officer Finley was credible. Once he said he saw the vehicle parked more than 18 inches from the curb, he was credible and that when the officer asked whether the defendant had a driver's license, the defendant said no, therefore we were going to do the inventory search. And there's certainly no case law, as counsel indicates, saying that you have to wait and take the possible guns or drugs or whatever else is in that car and tow it to the impound lot before you can do the inventory search, that you can't do that while you're waiting for the tow truck. But there was a second and independent ground. And on both of these grounds, the evidence was properly admitted. And that is that there was probable cause to search the car for narcotics violations because as the district court found, surveillance had observed during the time period when Jose is waiting for the supplier to come, only one car pull up. There is an exchange observed. And although it is true that the officers did not see the coil going out, they only saw the plate of food going in, no other car pulls up during that time period. And shortly thereafter, the same officer who observed this, the same surveillance officer sees the car and radios for it to be stopped. There was probable cause to believe that this car was engaged in narcotics trafficking and that evidence thereof would be found. And that in itself was a sufficient basis for the search. Okay. Thank you very much, Ms. Erickson. Rebuttal from Mr. Crawford and then from Ms. Murthy. Thank you, Your Honors. Very briefly, Your Honors, I know I'm going to be walking a very thin line and I don't want to but there was one of those cases that I'm not allowed to make any reference to and the way that the court treated it is it treated If it's an unpublished case, I don't want to hear anything about it. Okay. If the others do, they can't. No. They're really not supposed to and we shouldn't let you argue it. Okay. Just with regard to the pre-inventory search, there is no case authority out there supporting a search by an officer prior to the impoundment of the vehicle. But rather, as the AUSA had indicated, the other grounds that the court had found for justifying the stop of the vehicle was probable cause that criminal activity was afoot. In other words, the automobile exception to the warrant requirement. However, the question I have, and if I may, if there was such probable cause to begin with, then why did the court put on two days of testimony to litigate this 18-inch, 36-inch or whatever it was, this is from the curb, to determine if there was probable cause to believe that a traffic violation had been committed under Knowles v. Iowa and all the other lines of authorities that say if police stop for a traffic violation, they have to establish the existence of the traffic violation. Why would they litigate it to that extent? If there was simply probable cause to believe criminal activity was afoot so that under Carroll v. United States, the automobile exception would just come into play. And I believe that undermines the prosecution's argument that there was probable cause to substantiate the stop based upon the automobile exception. And then just very briefly, if I may refer the court, I'm going to refer the court actually to the AUSA's own brief, pages 20 to 22, and there's the quotations from the district court in this particular case where he indicated the case lacks the complexity that typically is around in those types of cases where they introduce evidence of the structure of drug organizations. And based upon the simplicity or the basic nature of this particular group between the Vegas, essentially it was just the brothers and the wife, and those were the only people that I believe were ever connected to this alleged conspiracy. Since it was not a very complex, structured organization, the entire line of authority based upon that was irrelevant. And if the court looks at 20 to 22 of the brief, it shows that the court indicated he would be willing to allow testimony from the expert regarding packaging, value, dosage, those kinds of things. But Agent Marzola subsequently starts talking about in a typical drug organization, there's a leader, and below the leader there's individuals that store, handle, and distribute the narcotics, persons that launder money, someone to protect the narcotics during transactions. That's all on March 27th, 2002 at pages 129 and 130. I believe based upon that, that's outside of the scope of what the court said it was even willing to permit in the first place, and I believe under 403 it should have been excluded. Thank you, Mr. Crawford. Thank you, Your Honor. You're going to get the last word. I'm sorry if I talk too fast. Okay. I'm going to read from a couple of cases here on the prosecutor's duties here. This is U.S. v. Hunna. It says, The prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all evidence. The individual prosecutor has a duty to learn of any favorable evidence known by the others acting on the government's behalf. So that would apply to Agent Davis. I mean, Agent Davis knew that these statements had been made about Juan, and he's saying, I was not aware that the government was required to disclose such statements. Well, it's the prosecutor's duty to make him aware. He's got to know that. Let me understand the Brady theory then. If the government had not impeached your client at trial with his written confession, does this not become Brady material? But then it does become Brady material when they impeach him? So we're looking at the hypothetical situation where the government... He testifies at trial that my supplier was X. Right. And the government does not impeach him by saying, you signed this written statement saying your supplier was Y. So in other words, if the government hadn't called him a liar on the supplier issue, he wouldn't have been impeached. Right. I agree. Because, you know, I think the trial judge misunderstood in the sense that the trial judge was looking at whether this went to whether he dealt the drugs or not. That's not the issue. He's right up there saying, yes, I did deal the drugs. It's going to whether the jury perceives him as a truthful person. And other than the issue of whether the C.I. kept calling him, the only other issue by which the jurors could gauge how truthful he is, is this whole Mario Wand thing. So, yeah, that's what's wrong. What about this government's argument that if the prior statement came in, it shows consistency with his trial testimony on the supplier, but also shows a misstatement or lie about someone coming by at a certain time? The record's really vague on all of that. And at any rate, it's for the jury to decide. It's for the jury to hear all the evidence and to decide. It's not for me or the prosecutor or anybody else to decide. If even one juror had thought that maybe I believe Jose over the C.I. You know, maybe I do believe the C.I. called him a couple of extra times. If even one juror had believed that, that evidence should have come in. But I think Judge Gould's point was that if we allow that evidence to come in, it buttresses his testimony regarding Juan. But when the surveillance films come in, it shows he's lying about Mario. Mario's the only car there. Juan didn't come that day. I guess I hear what you're saying, but I think. If what we have to do ultimately in the Brady test is decide whether we lost confidence in the jury verdict, we have to also balance the prejudicial effect that the Brady evidence would have against Mario, right? Right. Right. And in doing that, I think we're going to look at exactly how much time and how many comments were made about the whole Mario Juan thing and the whole family business thing, which is relevant. And then, I mean. Juan never testified. He was never identified. No, I don't think the DEA made any real effort to take Juan seriously. I mean, pretty much have Special Agent Davis say, I didn't disclose the statement because I just didn't believe anything about Juan. I didn't believe Juan. The defense didn't produce him either. Right. Very interesting. Thank you, Ms. Murthy. Mr. Crawford. Thank you very much. The case is discharged. You're just admitted. We'll stand at recess for this. All rise. This court for the session is adjourned.
judges: Silverman, Gould, Bea